Isaac Scherr v. Commissioner. Hyman Moore v. Commissioner.
Scherr v. Commissioner
Docket Nos. 12413, 12414.
United States Tax Court
1947 Tax Ct. Memo LEXIS 76; 6 T.C.M. (CCH) 1067; T.C.M. (RIA) 47281; October 3, 1947
*76 Jacob Rabkin, Esq., 9 E. 40th St., New York, N. Y., and Wilfred Wyler, CPA, 60 E. 42nd St., New York, N. Y., for the petitioner. E. L. Woolf, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion In these cases, consolidated for hearing, the respondent has determined deficiencies in income taxes as follows: Calendar
Docket
Petitioner
year
Deficiency
12413
Isaac Scherr
1943
$24,633.02
12413
Isaac Scherr
1944
2,887.90
12414
Hyman Moore
1943
23,869.93
12414
Hyman Moore
1944
2,613.62 Those parts of these deficiencies are here in issue which result from respondent's holding that the income from a certain partnership was the income of both petitioners and not the income of petitioners and their wives. Findings of Fact Petitioners are individuals residing in Richmond, Virginia. They filed their tax returns for the taxable years with the collector of internal revenue for the district of Virginia. Tru Blu Co. is a partnership which, during the taxable years, was engaged in the wholesale wine and beer business in the vicinity of Richmond, Virginia. The business consisted of buying, selling, and delivering *77 wine and beer, and was carried on from a leased building comprising a warehouse and office. Until 1938 the petitioners Isaac Scherr and Hyman Moore were salesmen for a wine and beer concern in Richmond. In that year they organized a corporation to carry on a wholesale wine business. The corporation was organized with a capital of $3,000, and the stock was issued equally to the two petitioners. Isaac Scherr had no money of his own. His wife, Jean Scherr, had a bank account of $1,400, which she had saved from her own earnings, and which was all the money that she had. The $1,500 invested in his name consisted of this $1,400 plus $100 borrowed from a bank on a joint note of Isaac Scherr and Jean Scherr. The $1,400 payment by Jean Scherr has never been repaid. There was never any understanding for the repayment of that amount. The $100 bank loan was repaid in three installments during 1938 and 1939. Hyman Moore did not have any money to invest in the corporation. He borrowed $1,000 from a bank, on the endorsement of his brother. The other $500 was given to him for this purpose by his father-in-law at the request of his wife. The latter amount has never been repaid. In 1939 the corporation *78 began to distribute beer in addition to wine. Additional capital of $4,000 was required. Isaac and Jean Scherr borrowed $2,000 from Jean Scherr's mother, on a joint non-interest-bearing demand note, and invested this additional amount in the business. Hyman Moore obtained his additional $2,000 investment as a loan from his mother, which amount his mother had obtained as a mortgage loan from Mrs. Scherr's mother. Jean Scherr had been steadily employed from 1931 until the organization of the corporation. The Scherrs have one child, a daughter, who was 17 and 18 during the taxable years. Jean Scherr had to work to help support the household. In 1931, while her husband was in Richmond, she was employed in Baltimore as a shopper and parttime floor manager for a department store, and worked evenings and Saturdays on telephone research for radio programs. Her earnings were $35 to $40 per week. In 1935 she rejoined her husband in Richmond, but continued to work. Her principal work was as supervisor in radio and marketing research, for which she was paid five to ten dollars per day when employed. She was also employed in dress shops. She gave up this employment in 1938 when the corporation *79 was organized. From the time the business was started, Isaac Scherr and Hyman Moore have spent most of their time away from the office. In the early years most of their time was spent in selling and delivering wine and beer. During 1943 and 1944, both of them were required also to spend considerable time in buying their merchandise, partly because of wartime scarcity, and partly because of a 1943 Virginia statute prohibiting the sale of fortified wines other than in State stores. Several other salesmen were employed during these years. Scherr would leave at seven or eight o'clock in the morning, and would not return until eight, nine or ten o'clock at night. Except for an occasional stop at the office during the day, Moore was also on his truck from morning until night. At the time the business was started in 1938, Jean Scherr ran the office and warehouse. Until 1942 she was assisted by Rose Moore. This work included the checking in of trailers from out of town bringing in merchandise; writing invoices and checking outgoing orders; routing the truck; checking in the drivers and seeing that cash was properly turned in; taking telephone orders and giving information about merchandise *80 on hand; taking care of customers who came to the office to buy; interviewing salesmen offering merchandise for sale; keeping a perpetual inventory; keeping the daily sales and purchase records, and making the monthly sales and purchase reports required by the Virginia Alcohol Beverage Control Board; and giving information to A.B.C. Board agents on their nearly daily visits. Jean Scherr has been in charge of these essential activities from the time the business was started. She came to the office every day, and worked from 10 to 14 hours a day. She never left the office until one of the men returned at night. The wine and beer business is required to be a cash business by Virginia law. Jean Scherr handled all the cash, and was the only person who had the combination to the safe. She was registered as a salesman with the A.B.C. Board. She knew the business completely, and handled all aspects of it. She has always been "the boss" of the warehouse and office. Rose Moore also worked in the office from 1938 to 1942. The Moores, however, had one child in 1937 and a second in 1942. Because of her home responsibilities, Mrs. Moore was not able to devote as much time to the business as did *81 Mrs. Scherr and did not come to the office every day. In 1942, shortly before her second child was born, she stopped doing any work for the business. Until that time, the business had only occasional part-time help in the office. In 1942 the first full time office worker was employed to assist Mrs. Scherr. That employee was hired by Mrs. Scherr and was responsible to her. From 1938 until 1941, Isaac Scherr and Hyman Moore each received a salary of $50 per week from the corporation. Mrs. Moore received no compensation. Mrs. Scherr received from $10 to $15 per week to compensate for lunches, carfare, and a girl who stayed at home with the child. This amount was not considered by the parties as a salary. In 1939, when the corporation added the beer business, the corporate name was changed to Tru Blu Beer Corporation, and subsequently to Tru Blu Corporation. On July 1, 1941, the corporation was dissolved and the business was continued as a partnership under the name Tru Blu Co., with Isaac Scherr and Hyman Moore as partners. No consideration was given at that time to any interest of the wives since the Scherrs and the Moores were only concerned then that the business, which had not *82 been profitable, should survive. Early in 1942 Isaac Scherr was seriously injured while driving his truck. He was in the hospital for two weeks, and recuperated for several months. During that period Jean Scherr had the added responsibility of trying to keep his contacts and sell merchandise by telephone. During this period Jean Scherr was worried about her rights in the business in the event of her husband's death. She requested a definite interest in the business which should be in her own name. Scherr suggested that the matter be deferred. Jean Scherr brought it up again in November, insisting that her interest be recognized and that she have a right to a one-half interest in the business in the event of Scherr's death. Scherr then discussed it with Moore. Scherr stated that he felt that his wife was entitled to a partnership interest by reason of her investment and by reason of the time she was devoting to the business. Moore stated that it was unfair to give more consideration to Scherr's wife than to his own wife, because Rose Moore had given to the business all the time and cooperation that she could give. Moore also raised the question of his expected induction into the Armed *83 Forces, and stated that he wanted to protect his wife by giving her an interest in the business. After discussion it was agreed that there should be a four-way partnership. The decision was explained to the firm's accountant, who advised them that the partnership would also afford a tax advantage. On or about January 1, 1943, a partnership agreement was executed by Isaac Scherr, Hyman Moore, Jean Scherr, and Rose Moore. This agreement is incorporated herein by reference. The following are the salient features of the agreement: the parties agree to be partners; the partnership is to begin January 1, 1943, and is to continue indefinitely; capital is to be contributed equally by the four partners; profits and losses are to be shared equally; all partners are to devote full time to the partnership business; compensation for services shall be mutually agreed upon; checks are to be signed jointly by Isaac Scherr and Hyman Moore, or by a person authorized by them; profits shall be determined semiannually, and distributions shall be mutually determined by all the partners; any partner may retire upon three month's notice; upon death or retirement of any partner, the husband or wife of such *84 partner shall have the right to purchase his or her interest "by paying the value of such interest as may be determined by inventory and accounting"; upon final dissolution of the partnership, the net assets are to be divided among the partners "in accordance with their respective interest therein." At the time of this agreement the capital of the partnership was $19,618.66, which was credited to the respective partners in the following amounts: Isaac Scherr
$4,876.08
Hyman Moore
4,933.25
Jean Scherr
4,876.08
Rose Moore
4,933.25
On or about March 15, 1943, Isaac Scherr filed Federal and Virginia gift tax returns showing a gift to Jean Scherr in the amount of $4,876.08. Jean Scherr filed a donee return showing the same amount. Hyman Moore filed a gift tax return showing a gift to Rose Moore in the amount of $4,933.25, and Rose Moore filed a donee return showing the same amount. At the time the partnership agreement was executed the parties prepared a certificate to be filed in the office of the Clerk of the City of Richmond. This certificate was not signed or filed because the parties did not want to have the trouble of changing their A.B.C. Board license. *85 The license problem was complicated at that time by a price dispute then pending with the Office of Price Administration, which was subsequently settled for a small amount and finally determined in favor of the firm's position. The firm's bank and Dun and Bradstreet were advised of the new partnership. A few weeks after the formation of the partnership, Jean Scherr raised the question of her right to sign checks. The bank was notified that her signature should be accepted as co-signer with either Isaac Scherr or Hyman Moore. Pursuant to Scherr's instructions, the firm's accountant set up new books for the partnership, showing the partnership interests of Jean Scherr and Rose Moore. Both capital and personal services were essential to the business carried on by the partnership during the taxable years. Jean Scherr contributed to the business carried on during the taxable years by the partnership known as "Tru Blu Company" both capital originating with her and vital services. Rose Moore contributed to the business enterprise neither capital originating with her nor vital services. During the taxable years the business enterprise carried on under the name of "Tru Blu Company" *86 was a partnership of which Isaac Scherr, Jean Scherr and Hyman Moore were partners. One-fourth of the income of this partnership for each of the taxable years belonged to and was taxable to Jean Scherr; one-fourth to Isaac Scherr; and one-half to Hyman Moore. Opinion KERN, Judge: In these proceedings there is no serious dispute as to the general law applicable; see ; ; or as to the evidentiary facts. The dispute is as to whether, on the facts shown by the record and under the applicable rules of law, there was, during the taxable year, an existing, real and bona fide partnership, to be recognized as such for tax purposes, composed of Isaac Scherr, Hyman Moore, Jean Scherr and Rose Moore. There is no question but that Isaac Scherr and Hyman Moore were partners. The precise question is whether the partnership, for tax purposes included as partners Jean Scherr and Rose Moore. We are of the opinion that Jean Scherr contributed to the business carried on as a partnership during the taxable year both capital originating with her and vital services; and therefore was, in reality and *87 for tax purposes, a partner in the enterprise. We are of the opinion that Rose Moore contributed to the business neither capital originating with her nor vital services, and therefore was not, in reality nor for tax purposes, a partner in the enterprise. The facts are set forth in detail in our findings and require no discussion except as to our ultimate conclusion that Rose Moore did not contribute to the partnership capital originating with her. There is some testimony which appears to be to the effect that she obtained $500 from her father and contributed this to the business at its inception. There is also testimony that Hyman Moore received $500 as a gift from his father-in-law. From all the testimony we have concluded and so found, that Hyman's father-in-law gave him $500 for the purpose of establishing him in business and that this gift was made to him at the request of his wife, Rose. We are therefore unable to conclude that this $500 represented a contribution by Rose to the partnership of capital originating with her. Petitioners urge that a part of the partnership income should be allocated to Rose, even though her partnership interest should not be fully recognized, *88 under the rationale of , and . In view of our conclusion that no capital originating with Rose was contributed by her to the partnership, we are unable to agree with this contention. Decision will be entered under Rule 50.